Leo N. Donati and Gertrude M. Donati, Husband and Wife v. Commissioner.
Donati v. Commissioner
Docket No. 19504.
United States Tax Court
1950 Tax Ct. Memo LEXIS 34; 9 T.C.M. (CCH) 1067; T.C.M. (RIA) 50289; November 24, 1950
*34 Held, that the organization known as "Fibre Board Container Company" was, during the taxable years, a legal and valid partnership formed by the three owners thereof for legitimate business reasons, each partner contributing to the business both services and capital. Logan Morris, Esq., and James Mullen, Esq., 1001 S. Main St., Richmond, Va., for the petitioners. Paul E. Waring, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies of $350,615.48 and $235,961.22 in petitioners' income tax for the years 1943 and 1944, respectively. As a result of the Current Tax Payment Act, the year 1942 is also involved. Hereinafter Leo N. Donati is sometimes referred to as the petitioner. The sole question involved is whether, for the taxable year, the Fibre Board Container Company was a valid and bona fide partnership, consisting of petitioner, 50 per cent; Anthony J. Bagley, 25 per cent; and Thomas J. Bourne, Jr., 25 per cent. Findings of Fact The petitioners are husband and wife with residence at Richmond, Virginia. The returns for the taxable years involved were filed with the collector of internal *35 revenue at Richmond, Virginia. In 1915, David J. Donati, Jr., and his brother, the petitioner, formed a general partnership for the purpose of engaging in the manufacture of fibre board shipping cases under the firm name of "Fibre Board Container Company," each with a 50 per cent interest therein. There was no written partnership agreement between the two brothers. David J. Donati, Jr. was the executive head of the business, in charge of sales and purchases, and acted as credit manager. The petitioner was in charge of production. This division of duties continued throughout the life of the partnership. The company had in its employ C. W. Throckmorton and L. T. Stansbury, who had been with the company since 1927 and 1933, respectively. There were thoroughly trained and experienced in the business of the company. Anthony J. Bagley, then related to the Donatis neither by blood nor marriage, was brought into the business by David J. Donati, Jr. in 1935. David J. Donati, Jr. wanted to train Bagley in the part of the business with which he was most familiar, with the idea that should anything happen to the petitioner, Bagley would take his place. From 1935 to 1941 Bagley worked *36 under the supervision of David J. Donati, Jr. and was engaged in general office work, as well as in the selling end of the business. On November 18, 1937, he married Rose Elizabeth Donati, the daughter of petitioner. Prior to becoming associated with Fibre Board Container Company, he was the assistant to the vice president of John T. Wilson Construction Company. David J. Donati, Jr. suffered a heart attack in 1936, after which time, until his death on March 17, 1941, his activity was very limited. During this period C. W. Throckmorton, Jr., the assistant manager, and Bagley, ran the executive and sales portion of the business. Thomas J. Bourne, Jr. married the petitioner's daughter, Shirley Donati, in June of 1940. In June of 1941, Bourne was brought into the business and started in the office working on production reports or anything pertaining to the manufacture of boxes. He came to work with the business with the understanding that eventually the petitioner would take him and Bagley into the partnership. The petitioner was failing in health from 1941 on. He was examined by a heart specialist in January, 1941, and the diagnosis was that the petitioner had a definite heart *37 disease, with definite myocardium damage, with arteriosclerosis, and that he probably had a previous posterior coronary occlusion, with thrombosis and myocardial infarction. He also had diabetes mellitus. In March of 1942, the petitioner was again examined by his physician, the examination confirming the diagnosis made in January, 1941. His physician advised him to try to arrange his business affairs so that he could get out from under all of the responsibility and that he turn the actual managing of the business over to others. Between March, 1942, and December 27, 1943, his physician attended him off and on. On the latter date the petitioner suffered an actue coronary occlusion with thrombosis and myocardial infarction and was hospitalized from December29, 1943, to January 24, 1944. Thereafter it was necessary for the petitioner to keep a nurse with him for about a year. His physician again advised him absolutely to give up his trying to run the business in any way, and not to go to the plant. The petitioner was hospitalized again from September 7, 1944, to October 4, 1944, because of another acute coronary occlusion. Under the Uniform Partnership Act in force in Virginia, the *38 partnership was automatically dissolved by the death of David J. Donati, Jr. Under the terms of the will of David J. Donati, his entire interest in the partnership passed to his widow, Clara M. Donati. Petitioner, through his counsel, endeavored to form a partnership with Mrs. David J. Donati, Jr. To this end, negotiations were conducted with her and the First and Merchants National Bank, as co-executor, and a draft of partnership agreement was submitted for their consideration. These negotiations were unsuccessful for the reasons that David J. Donati, Jr. was known as the head of the business, and the capacities of the petitioner in the business world were unknown. Mrs. Donati's advisers were also apprehensive over the health of petitioner, and considered it inadvisable for Mrs. Donati to have all of her eggs in one basket, by continuing all of her interest in the business. David J. Donati left comparatively little in his estate other than his interest in the Fibre Board Container Company. Her advisers, particularly the bank, believed it to be to her best interest to sell her one-half interest rather than to enter into a partnership. After the widow of David J. Donati had declined *39 to enter into a partnership with petitioner, he considered the purchase of the one-half interest of thepartnership from his brother's estate. To explore this possibility, petitioner and his counsel took up the securing of a loan with the State Planters Bank and Trust Company with which the partnership did business. The loan was declined for the reasons that the bank had always known David Donati as the chief administrative officer of the business, and considered him to be the No. 1 man in the business. The petitioner was in the production end of the business and his capacity to take on the management of the business was unproven. The bank also understood that petitioner's health was not good and it felt that a loan in the amount requested was not justified by the financial statement of the business. Petitioner, having failed in his efforts to form a partnership with David Donati's widow, and while negotiations were being carried on with the State Planters Bank to purchase the estate's one-half interest, through his attorney, approached Galleher and Company, Inc., underwriters of Richmond, Virginia, for the purpose of having them finance the purchase of the estate's interest. Galleher *40 and Company refused to make the loan to petitioner as they doubted that he could run the business. They were advised that a partnership was contemplated, to consist of the petitioner, Throckmorton, Stansbury, Bagley and Bourne. Galleher and Company were anxious to have some of those connected with the business brought into the partnership, as they would all be required to sign the notes and thus be responsible for the loan. With the understanding that Stansbury and Throckmorton, as well as Bagley and Bourne, would be brought into the business, Galleher and Company agreed to purchase $450,000 of secured notes payable over 10 years, with right of anticipation. Accordingly, petitioner then proposed to Throckmorton, Stansbury, Bagley and Bourne, that they purchase the estate's interest, and a new partnership, consisting of these four and himself, be formed, petitioner retaining his 50 per cent interest, Throckmorton and Stansbury each having 10 per cent interest and Bagley and Bourne each having a 15 per cent interest. Throckmorton and Stansbury, because they did not want to endorse the $450,000 notes and thus endanger their personal estates, subsequently refused to enter into the *41 partnership. Bagley and Bourne each agreed to acquire a 25 per cent interest in the partnership and Galleher and Company consented to go on with the financing under the changed setup as they knew that Bagley had been with the former partnership for a number of years and considered him a capable man and that Bourne was a young man who would undoubtedly develop. They also understood that Throckmorton would stay with the company. With the financing thus assured, negotiations were carried on in behalf of the petitioner, Bagley and Bourne for thepurchase of the one-half partnership interest of the estate. An agreement was reached and executed on August 20, 1941, for such purchase as of the close of business on August 31, 1941, said agreement being signed by Clara M. Donati, the administrators of the Estate of David J. Donati, Jr. and the petitioner. The legal services in connection with securing the loan, the purchase of the estate's interest and the formation of the partnership were billed to and paid by the partnership and not by the petitioner. A written partnership agreement dated September 1, 1941, was signed by petitioner, Bagley and Bourne under which they agreed to carry on *42 the business as a partnership under the name of Fibre Board Container Company with the petitioner having a 50 per cent interest and Bagley and Bourne each a 25 per cent interest. A certificate of co-partnership, certifying the name of the firm as "Fibre Board Container Company" and the persons comprising the co-partnership as petitioner, Bagley and Bourne, was filed under the laws of Virginia on November 6, 1941, and duly recorded. Thereupon Mrs. David J. Donati, Jr. and the administrators of the estate, by deed and bill of sale dated September 1, 1941, conveyed to the new partnership the undivided interest of the estate in the business and assets of the former partnership known as Fibre Board Container Company. The price paid to the estate for the purchase of the partnership interest of David J. Donati, Jr. was $700,000, less one-half of the net profits from the business for the period from March 17, 1941, to the close of business on August 31, 1941, which profits amounted to $112,291.12. The computation of the amount paid is as follows: COMPUTATION OF AMOUNT TO BE PAID THE ESTATE OF D. J. DONATI, JR.
Control amount per contract
$700,000.00
Less: One-half of profits from 3/18/41 to 8/31/41
112,291.12
Purchase price of one-half interest
$587,708.88
Deduct: Withdrawals by Estate of D. J. Donati, Jr. from 3/18/41 to
8/31/41
$113,465.13
Less: One-half of profits from 3/18/41 to 8/31/41
112,291.12
1,174.01
Total cash to be paid on closing
$586,534.87
COMPUTATION OF GOOD WILL
Purchase price of one-half interest in Board Container Company
$587,708.88
Less: Capital account of D. J. Donati as adjusted at March 17, 1941
442,191.88
Good will (paid to Estate of D. J. Donati, Jr.)
$145,517.00
*43 The loan agreement between Galleher and Company and the partnership was executed on October 14, 1941. The agreement was signed by petitioner, Bagley and Bourne, "A general partnership trading as Fibre Board Container Company." Galleher and Company made it a condition that the loan be secured by the property of the partnership, that petitioner join in the notes and that the notes be paid through the partnership. Accordingly, the three partners signed the notes and jointly and severally guaranteed their prompt payment. The settlement date of the loan was November 6, 1941, at which time checks in the amount of $441,162.66 and $32.53, made payable to the Fibre Board Container Company, were turned over to the partnership and on the same date the final settlement was made with the Estate of David J. Donati, Jr. Galleher and Company bought the notes at 98, and also paid certain expenses in connection with the loan which accounts for the difference between the total of the checks and the $450,000, the face of the notes. Payments to the estate of David J. Donati, Jr. were made by check dated August 21, 1941, in the amount of $100,000 and the balance of $586,534.87 by check dated November 6, 1941. Both *44 of these checks were drawn by the Fibre Board Container Company and were signed by the petitioner. The balance sheet of the old partnership as of August 31, 1941, showed cash of $270,645.10. The total net worth of petitioner as of October 8, 1941, exclusive of his interest in the Fibre Board Container Company was approximately $77,000, of which $10,277.69 was in cash. Neither the petitioner nor the partnership was in financial condition to meet thepayment of $586,534.87 due the David J. Donati estate, without securing a loan. Bagley and Bourne each agreed to pay the petitioner $135,541.70 for their respective interests of 25 per cent in the partnership, and executed notes dated September 1, 1941, for that amount, bearing interest at three per cent secured by pledge of their respective interests in the partnership. The notes were negotiable and were payable absolutely. The sum of the two notes was equal to one-half of the net worth of the partnership as shown by its books as of September 1, 1941. The capital accounts of the respective partners on the books of the new partnership as of September 1, 1941, were as follows: Leo H. Donati
$271,083.41
Anthony J. Bagley
135,541.70
Thomas J. Bourns
135,541.70
Total
$542,166.81
*45 The notes sold to Galleher and Company were paid off by the partnership by the following payments: Date of Check
Amount
Apr. 27, 1942
$ 22,412.50
Mar. 30, 1942
53,000.00
Oct. 27, 1942
73,321.00
Mar. 29, 1943
60,031.25
Sept. 27, 1943
101,958.33
Oct. 26, 1943
165,225.00
The notes given to petitioner by Bagley and Bourne in payment of their interest in the partnership were paid as follows: Year
Bagley
Bourne
1942
$ 30,453.52
$ 30,619.54
1943
38,620.67
38,375.30
1944
35,655.51
32,041.92
1945
32,715.62
31,994.63
1946
7,030.79
11,688.33
Total
$144,476.11
$144,719.72
Principal of notes
135,541.70
135,541.70
Interest paid
$ 8,934.41
$ 9,178.02
Detailed capital accounts were set up and maintained on the books of the partnership showing all charges, withdrawals, transfers and profits to the several partners. These accounts, in all respects, followed the proportions of ownership agreed upon between petitioner, Bagley and Bourne. Since the formation of the partnership in 1941, Bagley and Bourne devoted their full time to the business of the partnership with the exception of the time Bourne was serving in the Armed *46 Forces from December 1, 1944, to August, 1946. After the formation of the new partnership, Bagley devoted his time to the executive and sales end of the business. He was in complete control of the office and had complete authority to hire and fire people in his department. Bagley discussed all important business policies with the other partners, the petitioner and Bourne. If the problem was of a minor nature, whoever happened to be interested in that particular problem made the decision. When the petitioner's health became impaired he tried to lessen his responsibilities, so Bagley took over his end of the executive part of the business. Matters of major policy would be discussed with the petitioner, but the ultimate decisions on other matters would be made by Bagley and Bourne. Throckmorton and Stansbury always received their instructions on important matters from the partners and were under their supervision. After the formation of the new partnership Bourne assumed petitioner's duties in the plant. His title was General Manager in Charge of Manufacturing, and he was in complete charge of manufacturing in the Richmond plant. Stansbury was in production, and as orders came in *47 he would sort them as they should be run according to the dates. He then turned them over to Bourne who would route them through the plant in the most economical way to be manufactured. Right after the formation of the new partnership the general foreman and the foremen of the plant were called downstairs in the main office and told that Bourne would take petitioner's place as manager in charge of manufacturing, and also a notice to that effect was posted on the bulletin board to the employees. He had the right to hire and fire employees. The policies of the business were discussed with Bourne, particularly anything that had to do with manufacturing or machinery. Most of the discussions were with the petitioner, Bagley and Throckmorton. If there was any important sales policy to be decided it was discussed with Bourne, but the minor sales questions were not discussed with him. When the petitioner was away from the office on account of illness, Bagley and Bourne ran the business as they saw fit. When there was something that was very important it was discussed with the petitioner. Partnership earnings withdrawn from the business by Bagley and Bourne went into their personal checking *48 accounts and were used for their own benefit. The petitioner had no control over these funds. The three partners jointly decided the amounts to be withdrawn from the business each year. After the payment of the Galleher and Company notes Bagley and Bourne were still indebted to petitioner on their notes. Consequently, they did not draw out any more than was absolutely necessary until such time as their notes had been paid. After that they increased their withdrawals from the partnership. There was never any disagreement among the partners as to the amount that should be withdrawn from the business. The assets of the partnership were sold to the Robert Gair Company in June, 1949, which was owned by entirely different interests. This company organized a corporation by the name of "Fibre Board Container Corporation" to take over the assets and operate the business. The proceeds received from the sale consisted of cash and notes and preferred stock of the new corporation. The partnership was liquidated thereafter in 1949 and the assets were distributed to the individual partners in accordance with their partnership interests under the partnership agreement and in comformity with their *49 capital accounts on the partnership books, after which the partnership was, by written agreement, dissolved. The following is the schedule of distribution: ANALYSIS OF PARTNERS' CAPITAL ACCOUNTS January 1, 1949, to December 30, 1949 Total
Donati
Bagley
Bourne
Balance - Jan. 1, 1949 - per audit report
$1,570,844.80
$ 920,826.19
$309,367.40
$340,651.21
Add: Net profit per 1949 Fed. partnership income
tax return
203,473.33
97,569.99
52,951.67
52,951.67
Capital gains per 1949 Fed. partnership in-
come tax return
445,519.77
222,759.89
111,379.94
111,379.94
Increase in cash value of life insurance
155.12
77.56
38.78
38.78
Reserve for bad debts created out of capital
7,500.00
3,750.00
1,875.00
1,875.00
Cash paid Apple Cole Co. by partners direct
20,000.00
10,000.00
5,000.00
5,000.00
$2,247,493.02
$1,254,983.63
$480,612.79
$511,896.60
Deduct: Contributions per 1949 Fed. partnership in-
come tax return
$ 1,849.75
$ 924.87
$ 492.44
$ 462.44
Cash withdrawals by partners during 1949
943,691.32
603,896.52
154,255.49
185,539.31
Organization expense charged off
3,000.00
1,500.00
750.00
750.00
Following assets distributed to partners: Mortgage notes
500,000.00
250,000.00
125,000.00
125,000.00
Preferred stock at $10.00 per share
780,000.00
390,000.00
195,000.00
195,000.00
Automobiles at depreciated cost
5,127.53
1,750.03
1,688.75
1,688.75
Account receivable from Martha Barbour
500.00
250.00
125.00
125.00
Account receivable from J. T. Harrington
1,964.08
982.04
491.02
491.02
Account receivable from Roland Pugh
208.00
104.00
52.00
52.00
Account receivable from L. T. Stansbury,
Jr.
2,265.59
1,132.79
566.40
566.40
Stock - Atlantic Rural Exposition - 10 shares
460.00
230.00
115.00
115.00
Stock - Richmond Cedar Works - 183 shares
3,934.50
1,967.25
983.63
983.62
Stock - Bassett Country Club - 1 share
500.00
250.00
125.00
125.00
Refund of withholding taxes due from U.S.
Government
3,992.25
1,996.13
998.06
998.06
$2,247,493.02
$1,254,983.63
$480,612.79
$511,896.60
*50 Bagley and Bourne placed the notes and preferred stock in their respective safe deposit boxes. The cash was deposited in their respective individual checking accounts. The petitioner has no control over these checking accounts and does not have access to the safe deposit boxes. Bagley is at present the vice president of the Fibre Board Container Corporation. Bourne is division manager of the Richmond Division of the Fibre Board Container Corporation. The partnership filed returns for the taxable years in question showing the distributive share of each partner in the partnership net income, and the individual partners filed returns for the taxable years in question, in which each reported his distributive share of the partnership income as shown by the partnership returns. The Commissioner determined that all of the partnership net income for the taxable years in question was taxable to the petitioners. The petitioner, Bagley and Bourne, in good faith and acting with a business purpose, intended to and did join together for the purpose of carrying on the business of the Fibre Board Container Company as a partnership and sharing in the profits and losses or both. The partnership *51 was a real and bona fide organization and not a mere tax saving device. Opinion VAN FOSSAN, Judge: The facts in this case lead irresistibly to the conclusions last above stated. The three men, petitioner, Bagley and Bourne, intended, in good faith and for purely business reasons, to form a partnership. This, they accomplished. The written agreement bespeaks their sincerity and the publication of the fact gave notice to all the world. Their books recorded the transactions and their several interests accurately and reflected the reality of the partnership. The evidence overwhelms the contention of respondent that the partnership was a tax saving sham. It was not, as respondent would have us hold, a mere reallocation of income within a family group. Their relationship by marriage may have brought the parties closer together but in their business dealings they maintained toward each other a proper business attitude. Each contributed capital and vital services to the operation. Respondent, in his brief, makes much of the fact that petitioner was the father-in-law of the two other partners and employs and reiterates the term "sons-in-law" as though it were a term of opprobrium. Although *52 we have given the facts the close scrutiny admonished by the Supreme Court as proper in family transactions, we find no word of testimony to support respondent's main thesis that the partnership was a sham or a fraud on the revenue. Feeling as we do that the creation and operation of the partnership was a genuine business transaction and that a reading of the facts impels our conclusion, we see no purpose in repeating the facts or discussing the authorities. The holding of the respondent was in error. Decision will be entered under Rule 50.